# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
No. 20-1592V
UNPUBLISHED

| | |
|---|---|
| AMY TAPPENDORF,<br><br>               Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>               Respondent. | Chief Special Master Corcoran<br><br>Filed: February 23, 2024 |

*Ronald Craig Homer, Conway, Homer, P.C., Boston, MA,* for Petitioner.

*Ryan Pohlman Miller, U.S. Department of Justice, Washington, DC,* for Respondent.

### DECISION AWARDING DAMAGES[1]

On November 16, 2020, Amy Tappendorf filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"), alleging that she suffered a Shoulder Injury Related to Vaccine Administration ("SIRVA") as a result of a human papillomavirus ("HPV") vaccine administered to her on March 22, 2019. Petition, ECF No. 1. The case was assigned to the Special Processing Unit of the Office of Special Masters (the "SPU"). Although entitlement was conceded, the parties disputed the proper damages to be awarded.

For the reasons described below, and after holding a brief hearing, I find that Petitioner is entitled to damages in the total amount of **$189,387.11, representing an**

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

**award of $185,000.00 for Petitioner's actual pain and suffering, as well as $4,387.11 for Petitioner's unreimbursed expenses.**

## I.   Relevant Procedural History

As noted above, this case was initiated in November 2020. On February 25, 2022, Respondent filed a Rule 4(c) Report in which he conceded that Petitioner was entitled to compensation in this case. ECF No. 32. Accordingly, on March 2, 2022, I issued a ruling on entitlement in Petitioner's favor. ECF No. 35. After attempting to informally resolve the issue of damages, the parties informed me in February 2023 that they could not do so. ECF No. 52. I therefore provided the parties an opportunity to file written briefs, and later scheduled this matter for an expedited hearing and ruling. ECF No. 53; ECF No. 61; Hearing Order (Non-PDF) filed November 16, 2023.

The hearing was held on January 29, 2024, and addressed an appropriate award of pain and suffering and Petitioner's unreimbursed travel expenses.[3] Petitioner requests that I award him $205,000.00 for past pain and suffering. ECF No. 56; ECF No. 60. Respondent proposes that I award the lesser amount of $165,000.00 for actual pain and suffering. ECF No. 58. The parties agreed to unreimbursed expenses of $3,728.58, but dispute both the appropriate rate and incurred mileage related to Petitioner's unreimbursed travel expenses. ECF No. 58 at 2, 9-13; ECF No. 58-1 at 4 (Appendix A of Respondent's brief); ECF No. 60 at 2-7, Appendix A at 4-5.

## II.   Legal Standard

In another recent decision, I discussed at length the legal standard to be considered in determining damages, and prior SIRVA compensation within SPU. I fully adopt and hereby incorporate my prior discussion in Sections V and VI of *McKay v. Sec'y of Health & Hum. Servs.*, No. 21-0071V, 2023 WL 9231565, at *6-8 (Fed. Cl. Spec Mstr. Dec. 11, 2023).

In sum, compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996). Factors to be considered when determining an award for pain and

---

[3] A transcript of the January 29, 2024 Hearing was filed on February 15, 2024, and incorporated by reference herein. ECF No. 65.

suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering.[4]

### III.   Appropriate Compensation for Pain and Suffering

In this case, awareness of the injury is not disputed. The record reflects that at all times Petitioner was a competent adult with no impairments that would impact her awareness of his injury. Therefore, I analyze principally the severity and duration of Petitioner's injury. In determining appropriate compensation for pain and suffering, I have carefully reviewed and taken into account the complete record in this case, including, but not limited to: Petitioner's medical records, affidavits, filings, and all assertions made by the parties in written documents and at the expedited hearing held on January 29, 2024. I have also considered prior awards for pain and suffering in both SPU and non-SPU SIRVA cases, and relied upon my experience adjudicating these cases. However, my determination is ultimately based upon the specific circumstances of this case.

As the record establishes, Petitioner (then 32 years old) received the HPV vaccine on March 22, 2019. Ex. 1 at 2. Only eight days later she sought medical care at an urgent care facility, complaining of "right shoulder pain for about eight days after receiving the HPV vaccine." Ex. 3 at 72. Petitioner was assessed with "[a]cute pain of right shoulder," stated that she had a physical therapy evaluation already scheduled, and was prescribed naproxen and cyclobenzaprine to treat her injury. *Id.* at 75.

Thereafter, Petitioner underwent virtually continuous treatment for her shoulder injury through December 2020, or approximately 21 months, including: one hundred (100) physical therapy sessions,[5] sixteen chiropractic treatments,[6] one steroid injection,[7] two

---

[4] *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) (quoting *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

[5] Petitioner's PT sessions occurred between April 5, 2019, and December 22, 2020. *See generally* Ex. 6; Ex. 17; Ex. 19.

[6] Petitioner underwent sixteen chiropractic treatments between August 6, 2019, and December 30, 2019. *See* generally Ex. 12.

[7] Petitioner received by intra-articular injection 12 mg of betamethasone and 4 mL of 0.25% bupivacaine following her second shoulder manipulation procedure on February 17, 2020. Ex. 14 at 10-11.

3

MRI scans,[8] two shoulder manipulations under general anesthesia,[9] and one arthroscopic shoulder surgery.[10] Following her last shoulder procedure, Petitioner completed her last post-surgery physical therapy session on December 22, 2020. Ex. 19 at 44-45. At that time her motion was improved, her reported pain level was at a 3-4/10, and certain shoulder symptoms persisted (such as a "'catch' at midrange with both passive and active motion that produce[d] pain"). *Id.* at 44-45.

Subsequently, Petitioner did not seek treatment for her shoulder for approximately five months, until on June 3, 2021, Petitioner returned to her orthopedist's office for a "reevaluation of her right shoulder." Ex. 21 at 6. Petitioner reported that over the prior two to three weeks she had noticed shoulder "tenderness" that was "exacerbated with certain movements." *Id.* She stated she did not have any loss of range of motion, and that her range of motion had improved since her last visit. It was also observed that she was one year out from her arthroscopic surgery for adhesive capsulitis. *Id.* Petitioner was assessed with proximal biceps tendinitis, declined a cortisone injection, and elected to take an oral anti-inflammatory for a fourteen-day course. She was advised to follow-up as necessary. *Id.*

Petitioner next sought shoulder treatment over seventeen months later on November 22, 2022, following a work injury. Ex. 23 at 15-16. Petitioner (a home-care nurse) reported to Judith Nayeri, DO, at her employer's Occupational Medicine office that

---

[8] Petitioner's first MRI scan occurred on July 8, 2019. The MRI Impression included: "[b]one marrow edema centered about the greater tuberosity extending into the neck of the humerus. Small cortical erosion of the posterosuperior humeral head near the teres minor attachment. Findings would be consistent with shoulder injury related to clinical history of vaccine administration (SIRVA)." Ex. 11 at 6.

Petitioner's second MRI scan occurred on January 16, 2020. That MRI Impression included:

> 1. Resolving marrow edema about the greater tuberosity and humeral neck. Small cortical irregularity at the posterior aspect of the head appears less conspicuous. There are no new areas of cortical irregularity/erosion.
> 2. Mild supraspinatus and subscapularis tendinopathy without discrete tear.
> 3. Likely fraying about the posterosuperior labrum without discrete labral tear.
> 4. Suggestion of adhesive capsulitis.

Ex. 14 at 8.

[9] Petitioner underwent her first right shoulder manipulation under anesthesia on July 23, 2019. Her diagnosis both before and after the procedure was recorded as right shoulder adhesive capsulitis. Ex. 8 at 10-11.

Petitioner underwent a second right shoulder manipulation under anesthesia on February 17, 2020. Her diagnosis both before and after the procedure was again recorded as right shoulder adhesive capsulitis. Ex. 14 at 10-11.

[10] Petitioner underwent a "right diagnostic arthroscopy with rotator cuff interval release and circumferential capsular release and extensive debridement of the shoulder" on July 15, 2020. Her diagnosis both before and after the procedure was again recorded as right shoulder adhesive capsulitis. Ex. 18 at 1-2.

the prior day she started to feel sore after grabbing a patient who was falling "with both [of her] arms under his and lower[ing] him to the floor." Ex. 23 at 15. Petitioner discussed with Dr. Nayeri her shoulder history following her vaccination, was examined, assessed with a "[r]ight shoulder pain/strain," and referred to physical therapy. *Id.* Dr. Nayeri completed a "Patient Status Report" in regard to Petitioner's visit wherein under "Provider Opinion" she indicated that Petitioner's injury was "Work Related" (as opposed to "Non Work Related" or "Undetermined"). *Id.* at 16.

On November 28, 2022, Petitioner was seen again at Occupational Medicine this time by a physician's assistant ("PA"), Sara Glover, as her symptoms persisted. Ex. 23 at 10-12. Petitioner reported experiencing tingling down her right arm and into her fingers. Ex. 23 at 10. Again, Petitioner's history of a right SIRVA was discussed, and she reported she had "been doing well with the shoulder, and had had occasional soreness on and off since her last visit with [orthopedist] Dr. Sullivan, but that she overall had been doing really well. She does not have any particular work restrictions, and she was happy with her progress until this injury." *Id.* Ms. Glover assessed Petitioner with a shoulder strain and arm paresthesia, stating she "just has strained her rotator cuff or *possibly* exacerbated her pre-existing problems with her shoulder." *Id.* at 11 (emphasis added). Ms. Glover also provided the "Provider Opinion" that Petitioner's injury was "Work Related." *Id.* at 12. Petitioner saw Ms. Glover a second time at Occupational Medicine on January 17, 2023. *Id.* at 4-6. It was discussed that she had continued symptoms in her right shoulder and continued to have some tingling and numbness in the fingers. Ex. 23 at 4. Ms. Glover's record provides that Petitioner "did not seem to be having [a] clear cervical radiculopathy at this time and it is *possible* this may be related to her shoulder injury or ulnar neuritis." *Id.* at 5 (emphasis added). However, again Ms. Glover provided the "Provider Opinion" that Petitioner's injury was "Work Related." *Id.* at 6. During this time period, Petitioner underwent six physical therapy visits. *See* Ex. 24 at 6.

Petitioner states in her affidavit and her Reply brief that she underwent subsequent right shoulder treatment, including an MRI, a steroid injection, and PRP injections between January 25, 2023 and May 25, 2023. Ex. 25 at 5; ECF No. 60 at 10-11, Appendix A at 4-5. However, medical records corresponding to this treatment have not been filed. In making my determination, I have fully considered Petitioner's sworn statements describing the pain and limitations she experienced both personally and professionally following her vaccination, up to the date of her supplemental statement (April 28, 2023). *See generally* Ex. 15; Ex. 25.

In sum, I find the record establishes that Petitioner suffered a relatively severe injury for nearly two years, but thereafter significantly improved – despite some lingering symptoms – following her third procedure (an arthroscopic surgery) and subsequent physical therapy. While I find that Petitioner's reported shoulder pain in June 2021 likely

5

represented a flare up of her prior SIRVA injury, her subsequent shoulder pain and treatment beginning in November 2022 was, more likely than not, attributable to her workplace injury. I observe that by November 2022 Petitioner had sought no treatment for her shoulder for over seventeen months. And when she next reported shoulder pain and sought treatment it was following a workplace injury. I acknowledge Petitioner's Occupational Medicine PA, Ms. Glover, speculated that Petitioner's prior shoulder injury had possibly been aggravated by her workplace injury (Ex. 23 at 5, 11), but Petitioner's lack of treatment for seventeen months when she previously had not hesitated to report symptoms of pain and seek out medical care is indicative that Petitioner had recovered from her SIRVA (albeit after extensive treatment). Indeed, this finding is supported by Petitioner's own statement to Ms. Glover following her workplace injury, providing that despite some occasional soreness, her shoulder was doing "really well," she had no workplace restrictions, and was "happy with her progress until this [workplace] injury." Ex. 23 at 10.  Additionally, both Ms. Glover and Dr. Nayeri completed "Patient Status Report[s]" wherein under "Provider Opinion" both indicated that Petitioner's injury was "Work Related" (as opposed to "Non Work Related" or "Undetermined"). *Id.* at 6, 12, 16.

Nonetheless, I find that Petitioner did suffer a severe injury. In particular, I take into consideration the extensive treatment Petitioner underwent to rehabilitate her shoulder – including *one hundred* physical therapy sessions and three separate procedures – in the twenty-one months following her HPV vaccination. *Pruitt v. Sec'y of Health & Human Servs.*, 17-757V, 2021 WL 5292022 (Fed. Cl. Spec. Mstr. Oct. 29, 2021) (awarding $185,000.00 for past pain and suffering), offered by Respondent[11] is a good comparable. There are factual distinctions between these two cases: Petitioner herein underwent significantly more physical therapy, while the *Pruitt* petitioner's MRI findings were more severe. ECF No. 58 at 21-22 (citations omitted). Additionally, the *Pruitt* petitioner underwent two arthroscopic procedures, while Petitioner underwent only two arthroscopic procedures. However, Petitioner herein underwent two shoulder manipulations – significant medical interventions, even if less severe than actual surgery.[12]

Accordingly, **I find that $185,000.00 represents a fair and appropriate amount of compensation for Petitioner's past or actual pain and suffering.**

---

[11] Respondent argues the *Pruitt* case represents a more severe injury of a greater progression, and therefore a lower award is appropriate herein, but I find it to be the best overall comparable for this case.

[12] Petitioner offers the following comparables: *Lawson v. Sec'y of Health & Human Servs.*, No. 18-882V, 2021 WL 688560 (Fed. Cl. Spec. Mstr. Jan. 5, 2021) (awarding $205,000.00 in past pain and suffering), *Elmakky v. Sec'y of Health & Human Servs.,* No. 17-2032V, 2021 WL 6285619 (Fed. Cl. Spec. Mstr Dec. 3, 2021) (awarding $205,000.00 in past pain and suffering) and *Mulloy v. Sec'y of Health & Human Servs.,* No. 19-1396, 2023 WL 2620653 (Fed Cl. Spec. Mstr. Feb. 21, 2023) (awarding $205,000.00 in past pain and suffering).While I find that Petitioner's comparables are reasonable, they represent on balance more severe SIRVA injuries.

**IV. Appropriate Compensation for Unreimbursed Travel Expenses – Mileage**

The Vaccine Act provides that a petitioner may recover "actual unreimbursable expenses incurred before the date of the judgment awarding such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation, . . . related travel expenses, and facilities determined to be reasonably necessary." Section 15(a)(1)(B).

The parties have agreed to an award of unreimbursed expenses of $3,728.58, but dispute both the appropriate rate and incurred mileage related to Petitioner's unreimbursed travel expenses for the mileage she incurred traveling to her SIRVA related medical treatment. ECF No. 58 at 9-13; ECF No. 58-1 at 4 (Appendix A of Respondent's brief); ECF No. 60 at 2-7, Appendix A at 4-5. Petitioner maintains that this travel should be reimbursed using the IRS business mileage rate for car use through 2023, for a total of $783.18. ECF No. 60 at 7, Appendix A. at 1-5. Respondent argues the lower IRS medical mileage rate should be applied, and Petitioner should only be awarded compensation of $211.95 representing her mileage incurred through 2021. ECF No. 58 at 13; ECF No. 58-1 at 4.

Preliminarily, I determine that Petitioner should only be awarded compensation mileage for travel incurred through 2021, given my finding above that Petitioner's shoulder treatment in 2022 and 2023 is related to her workplace injury. That date shall therefore act as a temporal "cap" on mileage allowed.

The issue of the appropriate mileage rate to apply is more complicated. For over 25 years, most Program cases have followed the logic in *Williams v. Sec'y of Health & Hum. Servs.,* No. 99-2239V, 1996 WL 608455 (Fed. Cl. Spec. Mstr. Oct. 10, 1996).[13] There, former Special Master Hastings discussed the distinction between a business and medical rate, relying on how the two are treated by the tax laws.[14] The greater business

---

[13] Although Respondent references a more recent decision involving the application of the medical mileage rate, that matter does not provide the support he suggests. ECF No. 58 at 9-10 (citing *Hood v. Sec'y of Health & Hum. Servs.*, No. 16-1042V, 2021 WL 5755324, at *11 (Fed. Cl. Spec. Mstr. Oct. 19, 2021)). As I have previously explained, the *Hood* petitioner (who suffered from Guillain-Barré syndrome) requested an amount to cover the cost of Uber rides to and from a recommended work hardening program, while Respondent countered that Petitioner should be able to drive himself to these sessions as the *Hood* petitioner's award included the amount needed to add hand controls to his car. *Hood*, 2021 WL 5755324, at *7. Although the *Hood* special master ruled in favor of Respondent, there is nothing in the decision to suggest that the lower medical mileage rate was considered (or even opposed). *Id.* at *11.

[14] The *Williams* decision, cited herein, references Internal Revenue Code (hereinafter "I.R.C.") Section 162 for the business rate, and Section 213 for the medical rate. Specific figures are at Internal Revenue Service,

7

mileage rate "is intended to cover *all* costs of driving a car," to include not only the operating cost of gasoline and oil, but also fixed costs of driving an automobile such as depreciation, maintenance, insurance, and repairs. *Williams*, 1996 WL 608455, at *2. Special Master Hastings deemed that rate appropriate for a Vaccine Act damages calculation, reasoning that the business rate reflected the "true" cost of car operation, and that the lower rate applied to certain tax deductions reflected an "artificial limitation that Congress has chosen to put upon the deduction," that was not also properly relied upon in the context of the Vaccine Act. *Id.*

Respondent argues, however, that the distinction set by Congress represents a "reasonable policy decision" and such decisions are a matter of public policy "that is not the appropriate realm of the judiciary." ECF No. 58 at 11 (citing *Hage v. U.S.*, 35 Fed. Cl. 737, 741 (1996) ("The courts have never been a proper place to debate public policy, though this may appeal to the judicial ego.")). Thus, the medical rate should be applied. And I am not otherwise bound by *Williams*. ECF No. 58 at 10 (citing *Hanlon v. Sec'y of Health & Hum. Servs*, 40 Fed. Cl. 625, 630 (1998) (the decisions of special masters are generally not binding on their colleagues), *aff'd*, 191 F.3d 1344 (Fed. Cir. 1999).

I accept the general logic of awarding a "medical" rate for vehicle usage associated with medical treatment (as opposed to a business purpose). However, *Williams* does implicitly seem to recognize that the context matters. Here, damages paid to claimants who have met the legal standard of proving a vaccine injury arise under the specific terms of the Vaccine Act – not the tax code. And the Vaccine Act mandates that a petitioner be awarded their "*actual*" unreimbursable expenses. Section 15(a)(1)(B) (emphasis added). A petitioner's actual travel expenses in their own vehicle include not only the operating costs for the mileage incurred, but also the fixed costs for the mileage incurred. Clearly, each mile driven in a vehicle increases wear and tear, thereby increasing fixed costs (*i.e.*, depreciation, repairs, etc.). An award based only upon the operating costs of the vehicle would not represent a petitioner's "actual" expenses incurred.

Moreover, and contrary to Respondent's argument, application of the business rate does not amount in an "optimized" award, rather than one that is merely reasonable, as directed by the Act. ECF No. 58 at 12 (citing *Earls v. Sec'y of Health & Hum. Servs.*, No. 90-70V, 1991 WL 44454, at *5 (Fed. Cl. Spec. Mstr. Mar. 18, 1991)(the special master therein "construe[d] the term [reasonably necessary] to mean that an award should provide compensation beyond that which is required to meet the basic needs of the injured person in the compensable areas but short of that which may be required to optimize the injured person's quality of life.") An example of an "optimized" award might be providing compensation for a petitioner to rent, or buy, a luxury vehicle for more

---

*Standard Mileage Rates*, available at https://www.irs.gov/tax-professionals/standard-mileage-rates (last accessed February 23, 2024).

comfortable travel to their vaccine injury related medical appointments, as opposed to using their own vehicle – and indeed such an award would be prohibited. But the same is not true simply because a higher rate (which best captures the "actual" vehicle usage costs) is appropriate.

Finally, other than disagreeing with the reasoning of *Williams,* Respondent has not offered evidence or legal citation supporting application of the lower medical rate herein. He has not, for example, shown that any other federal compensatory statutory frameworks apply the lower medical rate in comparable circumstances, and/or follow the I.R.C. differentiation of rates. Application of the higher rate is, at bottom, consistent with the Act's language. Accordingly, and in keeping with my own prior decisions, I find that Petitioner's travel expenses should be reimbursed using the IRS business mileage rate employed in *Williams*. *See Gibson v. Sec'y of Health & Hum. Servs.*, No. 20-0243V, 2022 WL 17820891, at *12 (Fed. Cl. Spec. Mstr. Oct. 5, 2022); *Kleinschmidt v. Sec'y of Health & Hum. Servs.*, No. 20-0680V, 2023 WL 9119039, at *7 (Fed. Cl. Spec. Mstr. Dec. 5, 2023).

I will therefore award Petitioner the travel expenses she seeks through 2021, based upon a business mileage rate, for a total of $658.53,[15] as well as the agreed amount of unreimbursed expenses, $3,728.58. The total amount of unreimbursable expenses awarded is as $4,387.11.

## Conclusion

**I award Petitioner a lump sum payment of $189,387.11, representing $185,000.00 for Petitioner's actual pain and suffering, plus $4,387.11 for Petitioner's unreimbursed expenses, in the form of a check payable to Petitioner.** This amount represents compensation for all damages that would be available under Section 15(a) of the Vaccine Act. *Id*.

This amount represents compensation for all damages that would be available under Section 15(a). The Clerk of the Court is directed to enter judgment in accordance with this Decision.[16]

---

[15] This number was calculated utilizing the figures provided in Appendix A of Petitioner's Reply Brief (ECF 60) and subtracting the proposed mileage awards for travel in 2022 and 2023. At the January 29, 2024, hearing, I inadvertently provided incorrect total award for Petitioner's mileage.

[16] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.

**IT IS SO ORDERED.**

<u>**s/Brian H. Corcoran**</u>
Brian H. Corcoran
Chief Special Master